Good morning and welcome. Mr. Siegel, when you're ready, you may proceed. Good morning, and may it please the court, counsel, I'm Assistant Attorney General Edmund Siegel on behalf of Attorney General Kwame Nolul and Illinois' Comptroller and Treasurer. Your honors, this court should reverse the circuit court and find that sovereign immunity bars Peterson's claim. At its most basic, the principle of sovereign immunity precludes an action by a plaintiff against a State official in his or her official capacity in a civil lawsuit for money damages. Damages in the circuit court is precisely what Peterson sought, and damages is the only relief that Peterson sought. It follows Well, let me ask. Does damages, can damages be defined as refund, restitution? I mean, what's the nature of damages in this case? Yes, Your Honor. It can be defined as damages or restitution or a refund. We're talking here about the sought transfer of the monies that were deposited into the general revenue fund to be returned to Peterson. There's no claim for injunctive relief, and they seek only damages according to their complaint. In this situation, sovereign immunity furnishes an independently sufficient rationale for this court to reverse the circuit court. That is to say, it's the threshold issue. If this court concludes that sovereign immunity bars this lawsuit and that the circuit court lacked jurisdiction, it does not have to consider any of the other issues before the court. It need not, and it should not. In order to recover, how should the plaintiff have proceeded? Your Honor, Mr. Peterson should have proceeded by invoking the protections of the protest monies fund, which has existed for nearly 60 years. It now contains, I think, the other day, $74 million, and in 2018, 75 different taxpayers successfully invoked the protections of the protest act and retrieved funds that were at issue and deemed by a court to be returnable to the plaintiff. They didn't do that here. The purpose of that fund is to keep the money out of the general stream so that it can be used. The general fund. General revenue, so that it can be otherwise returned if appropriate, right? Precisely. Would that also include the claim for the interest that accrued as a result of delay, as the other side argues, unreasonable delay in calculating the tax that was due, and therefore the interest was substantial? Yes, Your Honor, if I understand your question correctly. There's interest that accrued because of the time it took for the attorney general, for the tax payment to be made and for the certificate of discharge to be issued. But was it the payment to be made or for the calculation of the amount of tax due? Both, because there's principal interest and there were penalties. But if Your Honor, we're talking about loss of use, which is interest on top of the entire total that the party and partner... It was the tax bill, the interest that accrued, and a late penalty. Yes, which was... And the penalty was resolved. Correct. But the interest, what about that interest? If it's the attorney general's delay, why should the estate be bound to pay that interest? Well, I disagree with the premise that it was the attorney general's delay. Okay. The record shows that there was about a three-year period of time, from 2012 to 2015, when the attorney general was attempting to obtain necessary documentation and information from the estate. We do not have the underlying work papers... So you're suggesting it's the estate's delay. We didn't have the information that we needed, and when it came to the time that we issued our assessment, we stated in our letter that we don't have any basis to agree with your contention that you owe X. We disagree, and this is the tax bill on the estate. So in the typical situation, when the protest fund is involved, a party will deposit the principal, the interest, and any penalties, which is typical for a dispute of this nature or in others where the protest fund is involved, such as income tax disputes. In the Supreme Court's recent decision in Parmar v. Madigan on materially identical facts, the Illinois Supreme Court held that the circuit court properly dismissed a taxpayer's lawsuit to recover taxes paid directly to the treasurer. And there are five key similarities between that case and this appeal that are unmistakable. First, the estate's executor in Parmar sued both the attorney general and treasurer in their official capacities. So did Peterson. In Parmar, the executor paid in excess of $500,000 to the treasurer for estate taxes, and Justice Jorgensen, I believe that that included interest, then brought an action in circuit court claiming a cause of action under Section 15A of the act at issue here, which is the same provision at issue here. Peterson paid the treasurer nearly as much as Parmar did. Third, in both cases, the executor sued for the return of monies paid to the estate after not pursuing relief available from the protest monies fund. Fourth, the Supreme Court held that the attorney general and treasurer were entitled to sovereign immunity, and Peterson cannot evade that holding. Fifth, the court rejected the Parmar executor's claim that Section 15 of the act confers jurisdiction on the circuit courts for this type of action, not just an independent cause of action for a private actor. That holding dooms Peterson's argument here. Is there any differences between Parmar and this case? I see none that are material. There's one that they claim is the distinction, the key distinction, and that's the argument about something called the estate tax refund fund, which Parmar makes clear is a separate stream of revenue or fund in the general revenue fund. So Mr. Peterson claims he can obtain a refund from this fund because it contains money. Well, that's not enough. A lot of funds contain money. And there are a lot of funds that don't contain money. This is true, Your Honor. The fund, the claim about the fund does not salvage the argument for four reasons. First, Peterson forfeited this argument. It was never raised in the circuit court. In fact, secondly, Peterson concedes that he didn't have to invoke Section 13C for to speak to how this, the procedures work for obtaining recourse from this fund. He claims at page CC 105 in the record that the act did not mandate the filing of a petition for refund with the treasurer as a prerequisite to filing this lawsuit. Again, on C110 and 11, the same thing. In his summary judgment papers at C203. He confounded the Estate Tax Act II for overpayment, right? That's the gist of the argument, but there was no overpayment here. Overpayment doesn't mean that one pays 100% of the amount that's owed. We don't do an owing with a dispute about the Attorney General's ability to assess and collect in a particular period. What happens with this refund fund is that a taxpayer files an amended return because the facts changed. Something was incorrect with the initial filing. There was a valuation problem with property. It came to light later that the deductions were not calculated properly. The first step is to file an amended return with the Attorney General, which assesses the substance of the claim. That didn't happen here. Once the Attorney General weighs in on the validity of the amended tax return, the papers are transmitted to the Treasurer, which then does its own independent analysis and issues the refund check. Well, that's the second step. That didn't happen here either. So there's been no overpayment. Fourth, we were talking about this a moment ago. Peterson is wrong. This is the second distinction with Parmar, that loss of use, a term that's used in Parmar, matters. The taxpayer in Parmar sought interest for the amount of time that the entire litigation occurred, the period of time that the Attorney General took with his tax return, for interest, what I'm calling interest on top of everything. So if there was a, let's say, if there was a $500,000 total initial payment of interest, principal and penalty, Mr. Parmar, as I understand the case, wanted interest on top of all of that because he was separated from that amount of money. Peterson doesn't seek that, but it doesn't matter because Parmar holds that the entirety of the taxpayer's base refund demand, the principal interest and late payment, in the case of immunity. I'm sorry. I'm sorry. How about if the plaintiff wants to enjoin future conduct, what would the remedy be there? Court of claims? To enjoin future conduct? Yeah. By, say, the treasurer, by the AG's officer. In that instance, sovereign immunity would not apply because of the officer's suit exception. So that would allow, that would enable a lawsuit to go forward, in the circuit court, I believe, to seek an injunction against the attorney general or other officers. It's to bar conduct, future conduct. Correct, Justice Gordon. Let me ask you a question, though. Why was the late penalty of over $64,000 abated? I am not able to give you the precise answer to that from the record. It does not appear in the record. If the court wishes, I can file supplemental authority. But I will tell you from other cases that it is not uncommon for a Department of Revenue, which is not involved in this case, or other tax-deciding officials to abate penalties and sometimes interest at the request of the taxpayer. Okay. As a negotiation, possibly. Is that what it would be? Or a request and then a concession to the request? Quite possibly. Or some kind of amelioration. I want to turn to the argument about Section 15A as providing an independent cause of action to support this lawsuit. But we only get to this, again, if this court concludes that the estate tax refund fund argument here furnishes an exception to sovereign amenity. That's the threshold issue. So, Parmar, again, holds that Section 15 confers jurisdiction, potentially only in a limited and narrowed circumstance when sovereign amenity is not implicated. Well, what is that circumstance? We know from Parmar that there's an exception to sovereign amenity when the estate refund fund can be invoked with the procedures that I outlined a moment ago, the initial application followed by the treasurer's action. Those narrow circumstances don't apply here, again, because we don't have a valid, viable argument that there's a refund fund exception. And critically, there's not a single case that we could find that holds that Section 15 provides a private right of action against state officials. Peterson should not be the first party to invent this cause of action. There's a misunderstanding, I think, about what Section 15a does and doesn't do. It works in tandem with Section 16 of the Act, which is the section that explains that the attorney general can bring suit against taxpayers when taxes are owing, and the attorney general can also deputize state's attorneys when necessary. But private parties, as plaintiffs, don't come into play here. Nowhere are they mentioned in Section 15 or authorized. At one time, decades ago, they were allowed to bring such actions. We cited in our brief some cases from 1918 to around 1979. But the Act changed after that time. And since 1990, for the last 30 years, Section 15a has replaced the language that said, previously, any person or persons dissatisfied with appraisement or assessment can bring an action in the circuit court. Now, private parties are not so authorized. And I hear that my time is up, so I will return on the floor. Thank you. Thank you. All right, and Ms. Kim? Good morning, Your Honors. We will have to pull that microphone down just a bit so that we can hear you when the recording can take your argument. Thank you. Good morning, Your Honors. Can you hear me? Yes. Okay. Your Honors, as you have the submitted briefs and record to review, if it pleases the Court, I'd like to take this time to respond to some new arguments that were raised by the state for the first time in its reply brief. First, with respect to the state tax refund fund. First, as you heard Mr. Siegel, the state argues that Peterson is barred from invoking the refund fund because he did not raise it at the trial level. But the rule that issues not raised in the trial court are waived on appeal only applies to appellants. The rule does not apply to appellees. Appellees may, in fact, raise any issue on appeal in defense of the judgment  Kane v. Contarino, 2014, Illinois Appellate 2nd, 130482, paragraph 114. Illinois appellate courts also have an independent obligation to consider matters which go to the jurisdiction of the circuit court which can't be waived. Access to the refund fund goes to that jurisdiction. And finally, contrary to the state's contention that Peterson failed to cite to the record in support of its argument about the refund fund, Peterson cited extensively to the record on pages 17 and 18 of the appellee's brief to show his claim could be paid out of the fund. In addition, with respect to the refund fund, the state argues that Peterson cannot access the fund because he made no overpayment, as you heard Mr. Siegel argue, and conceded no overpayment. No, I think that's the state tax act is with respect to overpayment, correct? Correct. But the point is the state is arguing that Peterson cannot access the refund fund under the estate tax act because he, in fact, made no overpayment, and they argue that he conceded he made no overpayment. They also say that he failed to apply to the treasurer for a refund and therefore he can't access the refund fund, and also he can't access the refund fund because his damages are the same as Parmer's. None of these arguments are meritorious. How do you distinguish Parmer from this case? Parmer is distinguishable from this case, Your Honor, because in that case the Illinois Supreme Court expressly held that if a claim can be paid out of the estate tax refund fund under Section 13C of the act, that such a claim would not implicate sovereign immunity. And, Your Honor, this is for the same reason. Would you ever file under that, though? Your Honor, excuse me, can you repeat the question? You wouldn't file the way that you filed in this case in order to get to the refund fund, would you? Your Honor, the state's contention that the refund fund is unavailable because we didn't first follow administrative procedures for refund by filing a petition for the treasurer is not dispositive in this case. And the reason for that is because in the record the treasurer has admitted in this case that it has no authority to determine the Illinois estate tax. Illinois estate tax is determined solely by the Attorney General. The treasurer relies, in fact, on the Attorney General, and this is admitted in the lower court record in the treasurer's answer, that the treasurer relies on the Illinois Attorney General to determine whether an overpayment exists and whether a refund is due. It is a purely administrative function. Therefore, in this case where the AG disagreed that any refund was due, there would have been no point to apply to the treasurer for a refund. This is supported also in the record by the way that the refund petition actually looks. It's a one-page petition. It requires the petitioner to submit the certificate of discharge from the AG, basically authorizing the refund. There would have been no point to file a refund claim with the treasurer in this case, Your Honor, where the AG didn't first determine that a refund was owed. I'm not sure that that point is the issue. The issue is there is a procedure that, according to the regulations and according to the statutory authorities, shall be followed. Why would you not follow it if that's the direction? Your Honor, the Illinois Supreme Court has held that exhaustion of administrative remedies is not required. Parties are not required to exhaust administrative remedies when such administrative remedies would be futile or useless. That would have been the case here because, again, if we had filed a petition for refund with the treasurer, they would have had no authority to issue the refund. Moreover, and this goes to the heart of the issue in this case, by the time, according to Section 14, which is the administrative refund procedure to file with the treasurer, Peterson would have had to file the claim for refund within four years after the estate tax return was due, which was December 23, 2015. But the AG didn't issue its final determination that no further tax would be refunded until April 2016, nearly four years and four months after the estate tax return was filed. Therefore, by the time we got a final determination from the AG, we were already time-barred from filing an administrative refund claim with the treasurer, which, again, as I stated, would have been completely useless since the treasurer would have had no authority to issue the refund without the AG's say-so. Well, even if you weren't time-barred and you proceeded the way that you're saying, and you're saying, well, it would have been fruitless, how do you get past sovereign immunity? Your Honor, we get past sovereign immunity because our claim can be paid out of the estate tax refund fund. Section 13C of the Estate Tax Act, which creates the refund fund, says the fund is created specifically for refunds stemming from the overpayment of tax. Again, I think that in this case, Parmer, for example, the Illinois Supreme Court in Parmer never reached the issue of whether or not the administrative refund procedures would be a requirement, whereas, like in this case, it would be completely useless. We maintain that our claim is different from Parmer's because the Illinois Supreme Court in Parmer held that Parmer couldn't access the refund fund because he never claimed that there was a taxable transfer. His claim was based on something totally different. His claim was based on the fact that when the estate tax was paid in his case, there was a short window where actually there was no Illinois estate tax, and then later it was reinstated and applied retroactively. So his claim was that no taxable transfer occurred at all. We have not alleged that. The record supports the fact that there was a taxable transfer here. Our sole argument is that the assessment was time-barred by the statute of limitations, which is the heart of this case. Is the heart of this case also a second heart, possibly, that the Attorney General says no refund is due and you claim a refund is due? Is that the bottom line in this case? Yes, Your Honor, that's correct. The bottom line in this case is that we believe that the assessment was time-barred by a statute of limitations. The circuit court agreed with us. The Attorney General disagreed, obviously. Therefore, they didn't agree to the refund. That's why we're here. How long did it take the estate to get records to the Attorney General so that they— this was an argument that counsel made— so that they could engage in this assessment that was necessary? Yes, Your Honor, as stated in our appellee's brief statement of facts, there's actually no support in the record whatsoever for the state's contention that the records were not provided. In fact, the trial court specifically found in its judgment, and that's in the record C-240, that the state had the required information well within the time to assess, meaning well within three years. Of course, they took then three years and 11 months to assess. So again, there's just simply no support in the record for the state's contention. I would also note, the state argued that Peterson conceded somehow that no overpayment was made. But I need to point out, Your Honors, that the passages from the lower court pleadings the state has cited are taken completely out of context. And if you actually read what those briefs were about, in no way did Peterson claim that no overpayment was made, okay? This has always been about an overpayment of tax as a result of an illegal assessment. That is, an assessment that was beyond the statute of limitations to assess. And in fact, their argument about overpayment is completely unsupported. Their own cited case, Moran v. U.S., it's a Seventh Circuit case. In fact, the Seventh Circuit there acknowledged that payment on untimely assessment constitutes an overpayment, even if the tax was due. So there's absolutely no support for their contention that this was neither an overpayment or that an overpayment must mean a portion or partial refund or payment of the tax. There's no support for that whatsoever. There's no support for the fact that for their contention that Peterson conceded that there was an overpayment. That absolutely did not happen. So it's not, now it's not a matter so much of money as it is a matter of timing. Under Moran, you're saying even if I pay not enough, I'm still entitled to get it back because they didn't do what they had to do in the period of time allowed. That's correct, Your Honor. Do we have to follow that federal case? We don't have to follow that case, Your Honor, but that's the only case in the record right now that's been cited for what constitutes an overpayment. They seem to suggest that there's no overpayment if you actually owe the tax. There's nothing to support that argument. There's no provision to support that argument. The dictionary definition of overpayment doesn't support that argument. And in fact, what dictionary definition are you talking about? Excuse me, Your Honor, while I look for it. Overpayment seems pretty unambiguous. Correct, Your Honor. I think, I believe, and I don't have it right in front of me, but I believe an overpayment just simply means payment of something that wasn't due. Okay. It could also mean payment of more than the amount was due. And that would be, if there's money in an act, or if there's money in a fund, that would be the purpose of that fund, wouldn't it? To pay money that was overpaid. Yes. Not necessarily not due, but paid in excess of what was assessed. Correct. Payment in excess of what was due. Our contention is that due to the statute of limitations on the assessment, their assessment was time barred. They had no ability to collect the tax at that point. Therefore, whatever they collected on the tax wasn't due, and that we should get it back. That's been this contention the whole time. Finally, Your Honors, I'd like to just briefly address some of the State's new arguments in their reply regarding statutory interpretation and the statute of limitations. First, the State's argument that, and this is a quote, no statute of limitations runs against the sovereign in civil cases is just entirely irrelevant. The same side of the case pertains to whether a general statute of limitations on private litigants' right to sue extends to a sovereign. This case concerns a statute of limitations which, by its expressed terms, applies to and limits State action. Second, the State argues for the first time in its reply that there are statutory schemes in which assessment and collection are distinct concepts, citing examples where collection can occur without an assessment first. But none of these examples deal with the central question here, which is whether an assessment can be made after the time to actually collect the assessment has lapsed. For example, the provisions of the Internal Revenue Code cited by the State, which for policy reasons carve out exceptions to the general three-year statute of limitations on assessment for fraud or certain types of penalties, are still going to be collectible after they are assessed since collection under the Internal Revenue Code does not start to run until the assessment is made. Your Honors, I'd like to read a quote from Moran v. U.S. cited by the State. We believe it's instructive. An assessment is not a prerequisite to a tax liability. It is more or less a bookkeeping procedure that permits the government to bring its administrative approach apparatus to bear in collecting the tax. The Morans owed taxes and the government failed to assess them timely. That the Morans owed taxes and the government failed to assess them timely does not change that fact. The question is whether the government had the means by which to collect them. In this case, by the time the government, by the time the State had made its assessment, it had absolutely no ability to collect on that assessment, and that is the central focus of this litigation. But they had been paid. They had been paid, but they had, you know, but again, the payment was erroneous. Were they paid with any exception? Was there anything indicating a disagreement with the payment? Well, you know, we've argued in our appellee's brief, Your Honor, if I may answer the question. Yes, we've argued in our appellee's brief that, in fact, the payment was made under duress. It was made under false pretense. In fact, the letter demanding payment from the State threatened litigation, immediate litigation, unless the tax was paid within 16 days. That amounted to like a $432,000 payment in 16 days demanded, or else they will sue. Of course, that was impossible because by the time they actually assessed the tax, they were precluded from suing under the Estate Tax Act. Therefore, the payment was made under a misrepresentation. That's number one. Rendering the payment involuntary. And secondly, that same letter did spell out the interest and penalties that would accrue, which this Second District Appellate Court held in Parmar I would be enough to amount to duress of a payment. And that specific ruling was not overturned by the Illinois Supreme Court in their subsequent Parmar ruling. But while that's your position today, in fact, they were paid, notwithstanding the threat of litigation. And why wouldn't that threat of litigation cause you to say, wait a minute, these aren't owed and we'll take you on in litigation, as opposed to paying it without any notation that this is under protest, we don't owe this. I mean, shouldn't there have been some indication? Well, again, the letter didn't indicate that there was any recourse, right? There was just basically a threat. There was just a demand for payment. If you don't pay within 16 days, we'll sue you. But you clearly could have paid under the Protest Monies Act. Your Honors, while we acknowledge that the Protest Monies Act would have been one option, that is not what happened here. That is correct. Here's my question. Wasn't that your remedy? According to the Illinois Supreme Court in Parmar, that was not the sole remedy. What's the other remedy? The estate tax refund fund. In the same way that the Protest Monies Act carves out a special fund that's not a part of general revenue, such that if you utilize the Protest Monies Act, those funds are specially set aside. In that same way, that is the same reason why the estate tax refund fund does not implicate sovereign immunity, because those are not general revenue funds. They are set aside specifically to pay a refund of estate taxes due to overpayment of estate taxes. This was the ruling in Parmar. But you're saying this was an overpayment because it was late, because it was after the time to assess. This was an overpayment, correct, Your Honor. This was an overpayment because it was made pursuant to an illegal assessment, because the assessment was made after the statute of limitations had passed. But if I have the facts correct, you, on behalf of the estate or the estate, did not even attempt to do that. We did not attempt to do this. They did not file or they did not pay this money under the Protest Monies Act. Correct, Your Honor. We have acknowledged that. We did not pay under the Protest Monies Act. But according to Parmar, we believe that our claim can still be paid out of the estate tax refund fund. If you'd like to sum up, your time is up. Thank you. Okay. Thank you, Your Honor. Nothing further. Mr. Siegel, I know you have things you want to say, but let me ask my question as you approach. Counsel has indicated you've raised some new arguments in your reply brief. Do you have a response to that? We responded in our reply brief to arguments that they made. We cited different authorities, including the federal authorities that they mentioned. But we made in our opening brief at quite length the argument that assessment is not the same as collection. I'd be happy to answer any particular questions, but we didn't raise new arguments or reply brief tracks in our opening brief. Ms. Kim indicated when Justice Hutchinson asked her why they didn't just proceed with a lawsuit at that point, wouldn't there be an enormous amount of interest accruing were they not to pay that tax and just proceed via litigation? Not an enormous amount, but because interest is capped. Interest can be capped, and penalties are capped. Capped at what? I don't have at my fingertips the cap amount, but the issue came up in Parmar. Again, I can file a supplemental motion. I'm sorry, but I mean in this case. It's not an opportunity. Right, but the estate in this case was about a $4 million estate. Yes. Taxes were $267 and some, and the interest was over $100,000. So if they would have drug this out through litigation, there would be a large amount of interest that they would be paying. Correct? On that $4 million estate. Well, there didn't have to be litigation. There were some questions earlier about varying options. They could have decided not to pay. This is a three-year rush to judgment. This is not a sudden decision. Now I'm going back and I see my notes. Interest will continue daily at $74.23 until paid. Penalty $1,336 per month, max $66,810. Yes. Okay. But their option was not to pay, to wait for the Attorney General to sue them, as the Court has pointed out, to utilize the protections of the Protest Monies Act, which includes injunctive relief that holds everything in place. The money is deposited based on the initial determination, the interest as well. It doesn't accrue during the dependency of the circuit court case and the appellate court case, and after that, the money is deposited frozen in joint. They didn't do that. They never said, having read in their briefs or heard this morning that they didn't know about that option. They just decided, reading the Act to infer from Section 15 at the time, that that was a viable means for them to bring suit. They didn't seek the protection. They didn't invoke the idea of the estate of the refund fund until we moved to dismiss this appeal. I wanted to address a couple. I'm sorry. Well, I have a question about that. I think that's the right fund. Ms. Kim said it would have been useless to apply to the treasurer because your agency, your entity, has to make the decision, and you did not give them any substantive, other than you didn't give them a discharge letter, basically. Yes. Why should she then have to use that procedure? That, to me, is the conception here. The refund fund procedure is for overpayment, and when I say that on page 5 of my reply brief that they conceded that this was not a viable option for them, I think we're in agreement in some regard. I want to read their summary judgment filing, C-203 of the record. They say that the triggering event for filing an application for a refund with the estate treasurer is an overpayment of tax. Well, the precursor to that, as I think Ms. Kim stated, is filing an amended tax return with the attorney general. They didn't do that. They couldn't do that because there was no mathematical error here. There was no recalculation occasioned by discovery of improper valuation. There were no further deductions. They took the position that their valuation of the estate did not resolve in estate tax due in doing that we found. As to the point about appellant and appellee forfeiture, to be sure, Ms. Kim is correct that those cases that hold it applies only to the appellee. I'm sorry, to the appellant. But the Barbara case decided by this Court applies that principle to forfeiture by appellees as well. You can finish that thought. That was the end of my thought, Your Honors. I just want to conclude by stating that the threshold issue is sovereign immunity. It's the dispositive issue, and the Court need not address the other issues of voluntary payment, and Section 15, unless it concludes that there's an exception to sovereign immunity. We therefore ask that the Court reverse the circuit court. Thank you, Your Honors. Thank you. Thank you both for your argument. We will make a decision in due course, and we will now stand in recess to prepare for our next court.